# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**EARNEST JEAN JACKSON,**
   Petitioner,

v.          Case No. 12-CV-00554

**MICHAEL BAENEN, Warden,**
**Green Bay Correctional Institution,**
   Respondent.

## DECISION AND ORDER

Pro se petitioner Earnest Jackson brought this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 asserting that his state court conviction and sentence were imposed in violation of the Constitution. Petitioner is currently incarcerated at Green Bay Correctional Institution.

## I. BACKGROUND

The facts presented at trial were as follows: On December 23, 2003, petitioner, along with Gary Campbell and Juwan Noble, killed Matthew Crockett at Noble's apartment in Milwaukee, Wisconsin, because Crockett had stolen over $20,000 from petitioner. They beat Crockett, taped a plastic bag over his head and either poured bleach on him or injected acid into his body. When it appeared that he was dead, the three men placed Crockett's body in petitioner's trunk, and petitioner and Campbell drove to an area north of Milwaukee where they dumped and burned the body. Later, concerned that it might be discovered, petitioner directed Shanika McAfee, his then-girlfriend, to drive himself and Campbell to pick up the body. They took the body back to McAfee's house where petitioner

and Campbell used kitchen knives to cut off Crockett's head and hands. Petitioner and Campbell then drove the body over the Illinois border and again dumped and burned it.

On December 14, 2006, petitioner was charged with two counts including first-degree intentional homicide under Wis. Stat. § 940.01(1)(a) and mutilating a corpse under Wis. Stat. § 940.11(1), both as a party to a crime. A jury trial commenced in Milwaukee County Circuit Court on July 16, 2007, but defendant moved for a mistrial because the prosecution had failed to disclose the fact that McAfee, one of the state's key witnesses, had worn a wire while speaking with petitioner in May 2006. The wire was part of an unrelated drug investigation, and the prosecutor denied any knowledge of it and opposed the motion for a mistrial. Apparently, Detective David Baker from the drug enforcement unit had provided Homicide Detective Scott Gastrow with a disk that contained the conversations recorded by the wire, but Gastrow told the circuit court judge that he did not listen to the disk or put it in the homicide file because Baker said there was nothing useful on it. Gastrow said he "didn't believe it had any evidentiary value to the case whatsoever." (Trial Tr., July 19, 2007, 26:20-21, ECF No. 8-6.) Homicide Detective Erik Villarreal also told the judge that he was aware of the wire but did not mention it to the prosecutor because he did not believe it was relevant.

The judge granted the motion for a mistrial. Based on Gastrow and Villarreal's testimony, he concluded that the nondisclosure was unintentional but declared a mistrial because the confusion over the disk had caused a two-day delay in the proceedings and defense counsel still needed time to review it. The judge was concerned that any further delay would prevent the jurors from carefully considering the case and might result in the exclusion of an African-American juror who would not be able to return the following week.

2

A second trial was held on October 15, 2007. There were several significant lay witnesses. Mary Ashe, Crockett's mother, testified that petitioner had stopped by her house a few days before Crockett disappeared to tell her that Crockett had stolen money from him and that he was looking for Crockett. Ayodele Adelokun, a friend of Crockett's, testified that the last time she saw Crockett was on December 22 or 23, 2003, when she dropped him off at Noble's apartment. Gary Campbell testified that on December 23, 2003, petitioner asked him to come to Noble's house to help petitioner get Crockett. Campbell said he agreed to help petitioner and described in detail how he and petitioner had killed Crockett and disposed of his body. And Noble testified that he was hanging out with Crockett on December 23, 2003, when petitioner and Campbell rushed into his apartment and attacked Crockett. Once Crockett was dead, Noble said he helped carry the body out to petitioner's trunk. Andrea Henderson, who lived in the apartment below Noble, also testified that she had heard a scuffle upstairs and had seen three men carrying what looked like a body out to a car in the back alley shortly thereafter.

The other significant lay witness was McAfee. She had admitted her involvement in the crime to Detective Gastrow when she was brought in for questioning on December 20, 2004. She testified that in late December 2003 petitioner told her that Crockett had stolen money from him and that he had found Crockett. He then asked her to drive himself and Campbell to a spot north of Milwaukee to either pick up or drop off a body. When they returned to Milwaukee, McAfee said she dropped them off at her house and went to stay with a friend for several days. The prosecutor asked her if she remembered telling Detective Gastrow the following facts: 1) petitioner told her he had killed Crockett, 2) petitioner told her he had killed Crockett over a $20,000 theft, 3) petitioner's clothes

3

were ripped and disheveled when he arrived at her home after the murder, 4) petitioner said they had burned the body and that his brother had recommended cutting off the body's head and hands, and 5) petitioner said they had dumped the body in Illinois. She said she could not remember these details from her earlier statement. She remembered someone telling her they had dumped the body in Illinois, but could not remember whether it was petitioner or Campbell. She also said she was sure her earlier statement was accurate, but that she had forgotten some of the details because it had been several years. After McAfee left the stand, the prosecutor called Detective Gastrow and had him testify about the contents of McAfee's earlier statement including these five details.

The state also presented testimony from two expert witnesses. First, Chiara Wuensch, a DNA analyst with the state crime lab in Milwaukee, testified that she had collected blood samples from Noble's apartment and from Ashe. She said she used these samples to create DNA profiles and concluded that the DNA from Noble's apartment was from one of Ashe's children. She said she had asked Daniel Haase, the crime lab's database manager, to plug the profile from Noble's apartment into a national database to see if it generated a match with any unidentified remains. Haase did this and gave her a "hit report," which said the database had found a match between the profile created by Wuensch and a profile of DNA taken from a headless, handless body found in Illinois. Because there was a match, Wuensch concluded that the DNA from Noble's apartment and the body found in Illinois came from the same person. She said that because of the uniqueness of the particular DNA profile the chance that the DNA did not come from the same person was one in 23 quintillion (23 followed by 18 zeroes). Haase's report was admitted into evidence by the prosecutor without objection from defense counsel.

4

The state also presented expert testimony from Dr. Christopher Poulos, an Assistant Medical Examiner for Milwaukee County. He said he had reviewed an autopsy report for the body found in Illinois written by Dr. Mark Witek in the Lake County, Illinois, coroner's office. Based in part on that report, Dr. Poulos said he believed the body had been burned after it was decapitated. This evidence was significant because it showed the body had been mutilated after death. Dr. Poulos pointed out that photos of the body showed charring at the decapitation site, which indicated that the area was exposed at the time of the fire. He also noted that blood tests conducted by Dr. Witek showed there was no carbon monoxide in the person's blood. If the person had been burned alive, Dr. Poulos said there would have been carbon monoxide in the blood because the person would have inhaled large amounts of smoke. Dr. Poulos also noted that Dr. Witek had described tool marks on the wrists of the body and that these marks could have been caused by kitchen knives. Finally, he agreed with Dr. Witek that the cause of death could not be determined. On cross-examination, defense counsel pointed out that Dr. Witek's report said he had found soot in the person's lungs and asked if this changed Dr. Poulos' conclusion that the person was burned after death. Dr. Poulos said he could not assess whether there was actually soot in the lungs because he had not seen a picture of the lungs. Dr. Witek's report was admitted into evidence by the prosecutor without objection from defense counsel.

The jury convicted petitioner on both counts and sentenced him to concurrent terms of life imprisonment without extended supervision and a bifurcated term of five years confinement and five years extended supervision. With the assistance of counsel, petitioner filed a motion for postconviction relief under Wis. Stat. § 809.30 alleging that his trial counsel was ineffective. The circuit court denied the motion on June 1, 2009, the

5

Wisconsin Court of Appeals affirmed on April 27, 2010, and the Supreme Court of Wisconsin denied review on July 21, 2010. On October 19, 2010, petitioner filed a pro se motion for postconviction relief under Wis. Stat. § 974.06 raising several other grounds. The circuit court denied the motion on October 28, 2010, the court of appeals affirmed on August 4, 2011, and the state supreme court denied review on October 24, 2011. On December 6, 2011, petitioner filed a petition for a writ of habeas corpus in the state court of appeals pursuant to *State v. Knight*, 168 Wis. 2d 509 (1992). The petition was denied on April 3, 2012. Petitioner did not seek review in the state supreme court.

## II. DISCUSSION

A state prisoner can seek a writ of habeas corpus under § 2254 if he is "in custody pursuant to the judgment of a State court" and that custody violates "the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). However, a federal court cannot grant an application for a writ of habeas corpus unless "the applicant has exhausted the remedies available in the courts of the State." *Id.* § 2254(b). And once a state court has adjudicated a claim on the merits, a federal court may only grant habeas relief if the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Id.* § 2254(d). The phrase "clearly established federal law" refers to the holdings of the Supreme Court as of the time of the relevant state-court decision. *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000). The question "is not whether a federal court believes the state court's determination was

6

Case 2:12-cv-00554-LA   Filed 10/31/13   Page 6 of 15   Document 20

incorrect but whether that determination was unreasonable—a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007).

The petition includes nine claims for relief. Seven of these claims are ineffective assistance of counsel claims under the Sixth Amendment. To prevail on an ineffective assistance of counsel claim, a defendant must show: 1) that his attorney's conduct fell below an objective standard of reasonableness, and 2) that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Wash.*, 466 U.S. 668, 687–92, 694 (1984). When evaluating the first prong of this test, a court must consider counsel's performance from the perspective of counsel at the time of the alleged error, and there is a strong presumption that counsel's conduct was reasonable. *Id.* at 689–90.

Petitioner's first claim is that his trial counsel erred because he did not move for dismissal after the judge declared the mistrial. He argues that a second trial was barred by the Double Jeopardy Clause of the Fifth Amendment because prosecutorial misconduct caused the mistrial.[1] Petitioner raised this argument on direct appeal, and the Wisconsin Court of Appeals rejected it. The relevant federal law comes from *Strickland* and *Oregon v. Kennedy*, which held that a defendant who succeeds in obtaining a mistrial cannot be retried if the government engaged in conduct "intended to provoke the defendant into moving for a mistrial." 456 U.S. 667, 679 (1982). The state court found that the second trial was not barred by the Double Jeopardy Clause because there was no evidence that either

---

[1] The petition frames this as a stand-alone double jeopardy claim. Respondent points out that no double jeopardy claim was preserved for appellate review. In response, petitioner clarifies that his intent was to bring a claim for ineffective assistance of counsel. Therefore, I treat it as such.

7

the prosecutor or the detectives had suppressed the evidence obtained from the wire worn by McAfee in an effort to prejudice petitioner or provoke a mistrial. There was no evidence that the prosecutor was aware of the wire, and the trial judge found the detectives to be credible when they said they did not believe the evidence from the wire was relevant to the case. Thus, the state court concluded that petitioner's trial attorney did not act unreasonably when he decided not to move for dismissal on double jeopardy grounds because any such motion would have been denied. This conclusion was not contrary to and did not involve an unreasonable application of clearly established federal law.

Second, petitioner claims his trial counsel should have objected to the expert testimony provided by Wuensch on the ground that it violated his Sixth Amendment right to confrontation.[2] The Sixth Amendment Confrontation Clause provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." Prior to petitioner's trial, the Supreme Court interpreted this clause to prohibit a court from admitting into evidence "testimonial statements" from witnesses who are not present at trial unless the declarant is unavailable and the defendant had a prior opportunity to cross-examine the declarant. *Crawford v. Wash.,* 541 U.S. 36, 59 (2004). The Court defined a "testimonial statement" as "'[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact.'" *Id.* at 51 (quoting definition of "testimony" from 2 N. Webster, An American Dictionary of the English Language (1828)).

---

[2] The petition frames this claim and the claim related to Dr. Poulos' testimony as stand-alone claims under the Confrontation Clause, but petitioner again clarifies that his intent was to bring claims for ineffective assistance of counsel because his trial attorney did not preserve these claims for appellate review. Therefore, I treat them as such.

8

Petitioner argues that Wuensch's testimony violated the Confrontation Clause because she relied on Haase's assertion in the hit report that, "during a routine search of the profile [from the blood stains in Noble's kitchen] against the unidentified human remains index of the National DNA Indexing System, a match was discovered between this profile and one from an unidentified deceased person in Illinois." (Pet'r's Br. in Supp. of the Petition, App. B, ECF No. 15-1.) He contends that this statement was testimonial, and that his attorney should have demanded that Haase appear and testify about the database results. Petitioner raised this argument on direct appeal, and the Wisconsin Court of Appeals rejected it.

The Wisconsin Court of Appeals noted that under *Crawford* an expert is prohibited from summarizing the opinions of others but found that *Crawford* did not overrule *State v. Williams*, 253 Wis. 2d 99 (2002). In that case, the Wisconsin Supreme Court concluded that an expert can testify about testing done by someone else without violating the Confrontation Clause as long as the expert is "'a highly qualified witness, who is familiar with the procedures at hand, supervises or reviews the work of the testing analyst, and renders his or her own expert opinion.'" *Id.* at 114. Under this standard, the court found that defense counsel's decision not to object to Wuensch's testimony was reasonable because Wuensch did not simply summarize Haase's opinion. Instead, she reviewed the data Haase had gathered from the database using the DNA profile she had given him and formed her own opinion about the meaning of that data. Petitioner argued that he had the right to confront Haase under *Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009), but the court refused to consider this argument. The court pointed out that the question was

9

whether petitioner's counsel had acted reasonably based on what he knew when the trial was held in October 2007. Thus, it refused to consider the effect of any case decided after that date. *See Lilly v. Gilmore*, 988 F.2d 783, 786 (7th Cir. 1993) (noting that the Sixth Amendment does not require trial counsel to forecast changes or advances in the law).

The state court's conclusion was not contrary to and did not involve an unreasonable application of clearly established federal law. At the time of petitioner's trial, the Supreme Court had declared that a defendant had a right to confront anyone who provided a "testimonial statement," but it had not precisely defined this term. And the precedent from the Wisconsin Supreme Court allowed an expert to testify about test results gathered by someone else as long as the expert was providing her own analysis of those results. *See State v. Barton*, 289 Wis. 2d 206 (Ct. App. 2005) (holding that *Crawford* did not overrule *State v. Williams*); *see also U.S. v. Moon*, 512 F.3d 359, 361 (7th Cir. 2008) ("A physician may order a blood test for a patient and infer from the levels of sugar and insulin that the patient has diabetes. The physician's diagnosis is testimonial, but the lab's raw results are not, because they are not 'statements' in any useful sense."). Therefore, it was not unreasonable for the state court's conclusion that petitioner's counsel acted reasonably based on what he knew at the time of trial.[3]

Third, petitioner argues that his counsel should have objected to the admission of Haase's report into evidence on the ground that it contained inadmissible hearsay. The

---

[3] It is also important to note that a defendant's right to confrontation is waivable, and that defense counsel may choose to waive it where live testimony will "highlight rather than cast doubt upon the forensic analysis." *Melendez-Diaz*, 557 U.S. at 328. In this case, defense counsel may have concluded that having two DNA experts up on the stand testifying that the body in Illinois belonged to Crockett would only weaken defendant's case.
10

state court declined to consider this argument because it was not adequately developed. As a result, it is not clear that petitioner has exhausted this claim. Nonetheless, I will deny it on the merits. *See* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."). Even if petitioner's counsel should have objected to the admission of Haase's report, the error committed by counsel was not sufficiently prejudicial to petitioner to establish a violation of his right to counsel. The evidence contained in the report was cumulative because it simply repeated Wuensch's live testimony. And Wuensch's testimony was supported by Campbell's testimony and several pieces of circumstantial evidence.

Fourth, petitioner claims his trial counsel should have objected to the expert testimony provided by Dr. Poulos on the ground that it also violated his Sixth Amendment right to confrontation. Petitioner argues that Dr. Poulos' testimony should have been excluded to the extent that he relied on statements made by Dr. Witek in his autopsy report. The Wisconsin Court of Appeals rejected this argument on direct appeal. Even if trial counsel had erred by failing to object to Dr. Poulos' testimony, the court concluded that the error was not sufficiently prejudicial to establish a violation of petitioner's right to counsel. The court pointed out that Dr. Poulos' statement that the cause of death could not be determined did not hurt petitioner's case, and that the remainder of his testimony—that the body was burned after Crockett was killed—was cumulative. Campbell had already offered eye witness testimony on this point, and his testimony was corroborated by several pieces of circumstantial evidence. The state court's conclusion was not contrary to and did

11

not involve an unreasonable application of clearly established federal law. Not only was Dr. Poulos' testimony cumulative, but the critical part of his testimony was based primarily on his own review of the photos of the body and not on statements made in the autopsy report. Dr. Poulos said the photos showed charring at the decapitation site, which indicated the decaptiation occurred before the body was burned.

Fifth, petitioner claims that his counsel erred because he did not object to the admission of Dr. Witek's report into evidence on the ground that it contained inadmissible hearsay. The Wisconsin Court of Appeals declined to consider this argument because it was not adequately developed. Therefore, it is again unclear whether petitioner has exhausted his state court remedies. I will, however, deny this claim on the merits. Even if defense counsel should have objected to the admission of Dr. Witek's report, the error was not sufficiently prejudicial to establish a violation of petitioner's right to counsel. The report mostly repeated Dr. Poulos' live testimony. The only place where it varied was Dr. Witek's observation that there was soot in the person's lungs, a fact which defense counsel argued supported petitioner's case because it undermined Dr. Poulos' theory that the body had been burned after death. Thus, the admission of the report may have actually helped petitioner's case.

Sixth, petitioner claims his counsel was ineffective because he failed to object to Detective Gastrow's testimony about the statements McAfee had made to him in December 2004. Petitioner argues that this testimony was inadmissible hearsay. Petitioner raised this claim on direct appeal before the Wisconsin Court of Appeals, but he did not include it in his petition for review by the state supreme court. Therefore, he has failed to exhaust this claim. *See Lewis v. Sternes*, 390 F.3d 1019, 1025 (7th Cir. 2004) (noting that

the exhaustion requirement in § 2254 requires the petitioner to "raise the issue at each and every level in the state court system, including levels at which review is discretionary rather than mandatory"). Petitioner asks that I dispense with the exhaustion requirement under 28 U.S.C. § 2254(b)(1)(B)(ii), which allows a court to disregard the exhaustion requirement if "circumstances exist that render [the State's corrective] process ineffective to protect the rights of the applicant." But there is no reason to believe that the remedies available to petitioner were ineffective. Petitioner asked the state supreme court to review several of his ineffective assistance of counsel claims and he could have included this claim in his petition for review as well. If I conclude that the exhaustion requirement applies to this claim, petitioner asks that I dismiss it so he can proceed on the claims he has exhausted. I will grant this request and dismiss this claim.

Petitioner's seventh claim is that he was deprived of effective assistance of appellate counsel because his attorney on direct appeal failed to properly present his double jeopardy claim. Petitioner asks me to dismiss this claim because he concedes that he has not exhausted it. Petitioner raised this claim in the *Knight* petition that he filed in the Wisconsin Court of Appeals, but he did not ask the state supreme court to review the denial of that petition. Therefore, I will grant petitioner's request and dismiss this claim as well.

Petitioner's eighth claim is that he was deprived of his right to equal protection because the prosecutor used a peremptory strike to exclude a juror because the juror was African American. *Batson v. Kentucky* allows a defendant to challenge a prosecutor's decision to exclude a juror if the defendant believes the decision was racially motivated.

13

476 U.S. 79 (1986). If the defendant can make a prima facie showing that the prosecutor's decision was racially motivated, then the prosecutor must articulate a race-neutral explanation for the strike. *Id.* at 96–98. The trial judge has to decide whether the prosecutor's reason is valid and whether there was purposeful discrimination. *Id.* at 98. A reviewing court must give the trial court's determination great deference because it turns largely on an evaluation of the prosecutor's credibility. *Hernandez v. New York*, 500 U.S. 352, 364–65 (1991).

In this case, petitioner's attorney asked for an explanation of the prosecutor's decision to strike the juror, and the prosecutor said he "didn't have much of a read" on the juror. (Trial Tr., Oct. 15, 2007, 62:17–24, ECF No. 8-7.) The trial judge found this explanation to be credible and allowed the strike to stand. When petitioner appealed this ruling as part of his pro se motion for postconviction relief under Wis. Stat. § 974.06, the Wisconsin Court of Appeals affirmed. That court concluded that petitioner's argument was "not sufficiently developed or detailed to make a prima facie case that the prosecutor excluded the juror on the basis of race." *State v. Jackson*, 337 Wis. 2d 429, ¶ 8 (Ct. App. 2011) (unpublished opinion). Furthermore, even if petitioner had made a prima facie case, the court accepted the prosecutor's race-neutral explanation. *Id.* ¶ 8. This ruling was not contrary to and did not involve an unreasonable application of clearly established federal law.

Petitioner's final claim is that he is entitled to habeas relief because the evidence was not sufficient to establish guilt beyond a reasonable doubt. Petitioner concedes that he failed to exhaust this claim and asks me to dismiss it. This concession appears to be

14

unwarranted because he included this claim in his § 974.06 motion for postconviction relief and in his subsequent petition for state supreme court review. Nonetheless, because petitioner did not brief this claim, I find that he has abandoned it.

### III. CONCLUSION

**THEREFORE, IT IS ORDERED** that the petition for a writ of habeas corpus is **DENIED**. The clerk shall enter final judgment. Pursuant to Rule 11 of the Rules Governing § 2254 Cases, I find that petitioner has not made the showing required by 28 U.S.C. § 2253(c)(2), and therefore I will not issue a certificate of appealability.

Dated at Milwaukee, Wisconsin, this 31st day of October, 2013.

s/ Lynn Adelman
_____
LYNN ADELMAN
District Judge

15

Case 2:12-cv-00554-LA    Filed 10/31/13    Page 15 of 15    Document 20